IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KENNETH ANDERSON,            :
                             :
      Plaintiff              :
                             :   CIVIL NO. 1:CV-04-2666
      vs.                    :
                             :   (Judge Caldwell)
BUREAU OF PRISONS, *et al.*,  :
                             :
      Defendants             :


*M E M O R A N D U M*

*I.      Introduction.*

        Plaintiff, Kenneth Anderson, an inmate at USP-
Lewisburg, initiated this Bivens-type action,[1] alleging Eighth
Amendment claims of deliberate indifference to his serious
medical needs - an ongoing knee and lower back condition.
Plaintiff asserts that defendants' misdiagnosed his knee problem
as the source of his constant loss of equilibrium and severe
pain.  After undergoing arthroscopic surgery on his knee he
learned from a Chief Physical Therapist at FMC-Springfield that
his knee was not the cause of his problems "but a nerve in [his]
back's lower spine was causing his equilibrium being off center."

---

        [1]  In *Bivens v. Six Unknown Named Agents of the Federal Bureau
of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),
the Supreme Court recognized a private cause of action to recover
damages against a federal agent for violations of constitutional
rights.

(Doc. 1-2, p. 4).  Plaintiff claims his painful back condition continues to exist and is not responding to defendants' conservative form of treatment (Capsaicin cream).  He claims he has never received physical therapy, or other proper treatment or diagnostic testing, for his lower back condition.  Plaintiff seeks an independent medical evaluation and MRI of his back and monetary damages.  He names the Bureau of Prisons ("BOP") and the following employees as defendants: National Inmate Appeals Administrator Harrell Watts; Regional Director D. Scott Dodrill; Warden Joseph Smith; and Health Services Administrator J. Hemphill.  (Doc. 1).

Presently before the Court is Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment. (Doc. 19).  We will consider the motion under the well established summary-judgment standard.  *See Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 246-47 (3d Cir. 2002). The motion is based on: (1) the doctrine of respondeat superior; (2) Anderson's inability to bring a *Bivens* claim against Defendant Hemphill; (3) failure to state a claim; and (4) qualified immunity.  In support, defendants have submitted the declaration of Jon Hemphill, the Health Services Administrator at USP-Lewisburg, and portions of Plaintiff's medical record.

-2-

Anderson filed his opposition brief after receiving defendants' motion, but before they had to file their supporting brief and exhibits.  (Doc. 20).  After defendants filed their supporting materials, Plaintiff did not file additional opposition materials, or seek an enlargement of time to do so.

Also pending before the court is Plaintiff's motion for a preliminary injunction.  (*See* Doc. 14).  Therefore, the Court will consider Anderson's submissions in connection with that motion when addressing defendants' motion for summary judgment as the core issue (Plaintiff's health care) is identical and central to both motions.

II.      *Background*.

Anderson arrived at USP-Lewisburg on June 17, 2002, with a history of hepatitis and degenerative joint disease ("DJD") of his left knee.  (Doc. 22-1, Defendants' Statement of Undisputed Material Facts ("SMF"), SMF at ¶ 1).  In July 2002, he was seen and treated for arthritic pain in the left knee on several occassions.  An x-ray of his knee at the time revealed evidence of mild DJD.  (*Id*. at ¶¶ 2-5).  At that time he indicated that the pain was mild and aching and that his abilities to ambulate, eat, and conduct personal hygiene tasks were unimpared.  (*Id*. at ¶ 6).

-3-

On September 3, 2002, after complaining of severe pain and stiffness in his left knee, Anderson was placed on athletic restriction, prescribed medication and an x-ray of his knee was ordered. (*Id*. at ¶¶ 7-9). Ten days later, Capsaicin cream was added to Anderson's treatment plan. (*Id*. at ¶ 10). On September 23, 2002, after complaining of left knee pain and swelling, and indicating he had been shot in the same knee in 1982, an orthopedic consultation was requested. An exercise regimen was also explained to Anderson, his cream prescription was refilled, his medication changed, and his sport restrictions and knee brace were continued. (*Id*. at ¶¶ 11-13).

For the next three months, Anderson was treated at the institution's chronic care clinic on at least a monthly basis for complaints of continued difficulties with his left knee. (*Id*. at ¶¶ 14 - 16). On January 13, 2003, an MRI of Plaintiff's knee was ordered after he presented at the chronic care clinic with a painful and swollen knee. (*Id*. at ¶ 18). He was seen on January 23, 2003, and again on February 18, 2003, for chronic joint pain in his knee. (*Id*. at ¶ 19).

On March 1, 2003, Anderson was seen for complaints of continued daily pain and swelling in his left knee. Anderson indicated he had a history of arthritis in the knee and that he further injured it last year playing sports. He stated that his

-4-

knee gives out several times per week, and that he walks with a limp.  Anderson was given pain medication and Capsaicin cream. (*Id.* at ¶¶ 20 - 21).  Shortly thereafter USP-Lewisburg received Anderson's MRI results which revealed mild to moderate amount of joint effusion in the knee joint, a bone contusion, a tear in the lateral meniscus, and a rupture of the anterior cruciate ligament ("ACL").  (*Id.* at ¶ 22).

On March 3, 2003, Anderson was seen at the medical unit complaining of back pain.  (*Id.* at ¶ 23).  A week later his cream was refilled and he "appear[ed] to be well."  (*Id.* at ¶ 24).  He was counseled on the use of his neoprene brace, cream, and pain medications.  (*Id.* at ¶ 25).  On March 31, 2003, Anderson reported "having increasing difficulty" and pain in his left knee.  (*Id.* at ¶ 26).  He reported losing his balance when attempting to exercise.  (*Id.* at ¶ 27).  Anderson's medications were refilled and he continued to await an orthopedic consultation.  (*Id.* at ¶ 28).

On April 10, 2003, Anderson again complained of low back pain.  His examination revealed no gross abnormalities. (*Id.* at ¶ 29).  He was seen again on April 29, 2003, for mild and aching left knee pain.  It was noted that he was still awaiting an orthopedic visit on his torn meniscus.  (*Id.* at ¶ 31).  He was next seen at the chronic care clinic on June 16, 2003.  No signs

-5-

of acute distress or discomfort were noted.  His medication for dermatitis and low back pain were refilled.  (*Id*. at ¶¶ 32 - 33).

On July 9, 2003, Anderson was seen by an orthopedic consultant who diagnosed him with DJD, and a torn medial meniscus and ACL of the left knee.  (*Id*. at ¶ 35).  His knee was injected with medication and arthoscopic surgery with ACL reconstruction was recommended.  (*Id*. at ¶ 36).  On August 27, 2003, Anderson was referred to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP-Springfield"), for ACL reconstruction.  (*Id*. at ¶ 37).

Anderson departed USP-Lewisburg on September 25, 2003. (*Id*. at ¶ 39).  During a physical examination at USMCFP-Springfield on September 29, 2003, Anderson stated he was in good health and that "[h]e just wants his knee repaired." (*Id*. at ¶ 41).  He did not complain of back pain and it was noted as "nontender to percussion" upon examination.  (*Id*. at ¶ 42).  An x-ray of Anderson's knee taken the following day indicated early degenerative changes of the medial compartment of the left knee. (*Id*. at ¶ 43).

He was scheduled for an orthopedic surgery consultation on October 10, 2003.  (*Id*. at ¶ 44).  The surgeon's impression was of a chronic tear of the ACL, a tear of the lateral meniscus, and degenerative osteoarthritis of the left knee.  The surgeon

recommended Anderson undergo only the arthroscopic surgery, suggesting the ACL reconstruction might not be a good idea due to his age and significant arthritic changes.  (*Id*. at ¶¶ 45 - 47).

On October 27, 2003, an arthroscopic examination of Anderson's left knee with lateral meniscectomy was performed. Loose body and spurs of the medial femoral condyle were removed. (*Id*. at ¶ 49).  Anderson's ACL ligament was found to be intact. (*Id*. at ¶ 50).  Plaintiff's postoperative diagnosis was: (1) tear lateral meniscus left knee; (2) loose body intercondylar area of the tibia; and (3) osteophytes[2] of the medial femoral condyle. (*Id*. at ¶ 48).

Plaintiff left USMCFP-Springfield on January 28, 2004, listed as stable and having been diagnosed with: (1) "tear lateral meniscus left knee with repair;" (2) osteophytes of the left medial femoral condyle; and (3) hepatitis B&C positive. (*Id*. at ¶¶ 51- 52).  A transfer summary prepared by USMCFP-Springfield medical staff recommended: (1) home exercises by the physical therapy department; (2) no limitations on physical activity; (3) diet as tolerated; (4) follow-up care as needed; (5) no limitations on duty work status; and (6) no special appliances needed during transfer.  (*Id*. at ¶ 53).

---

[2]  Osteophytes is a medical term for bone spurs.

-7-

While temporarily housed at the Federal Transfer Center in Oklahoma City, Anderson was a no-show for sick call on February 10, 2004, but complained of, and was treated for, low back pain three days later.  Plaintiff then failed to report for sick call on February 19, 2004, but was treated for low back pain the following day.  Upon departing Oklahoma City, the diagnosis of low back pain was added to Anderson's conditions. (*Id*. at ¶¶ 54 - 56).

Anderson returned to USP-Lewisburg on March 1, 2004. Three days later he was prescribed medication after complaining of knee and back pain.  (*Id*. at ¶¶ 57 - 58).  A request for a telemedicine physical therapy evaluation was submitted by staff on March 18, 2004.  The request was denied and conservative treatment, i.e. use of a stationary bike, was ordered.  It was noted that the issue would be revisited in one month.  (*Id*. at ¶ 59).

On March 22, 2004, Anderson was examined for his hepatitis C and chronic low back pain radiating to his left calf. He was educated on the need for back strengthening exercises and dietary measures to reduce his cholesterol.  He was prescribed medication for his back pain and told to return in three months.   (*Id*. at ¶¶ 60 - 61).

Three days later Anderson was treated again for left knee pain and swelling.  (*Id*. at ¶ 62).  On March 26, 2004, an x-ray of Plaintiff's back revealed localized hypertrophic changes at L3 with anterolateral spurring and no evidence of fracture.  (*Id*. at ¶ 63).

On April 6, 2004, after complaining of low back pain and difficulty walking up stairs and exercising, he was referred for an MRI, told to continue his medication, and provided a description of mild back exercises.  (*Id*. at ¶ 64).  On April 14, 2004, the clinical director denied the MRI request, directed conservative treatment be followed, and "then re-evaluate."  (*Id*. at ¶ 65).

On April 16, 2004, Anderson was given a knee brace due to his complaints of continued pain and swelling in his left knee.  He reported he was unable to do much physical therapy at USMCFP-Springfield due to pain and that he was not doing rehabilitation exercises provided at USP-Lewisburg because his "balance ain't no good."  (*Id*. at ¶¶ 66 - 67).  Anderson also complained of low back pain and indicated that he was "told" that his knee problems were the result of his back.  Anderson requested back surgery.  He was prescribed medication and a telemedicine rehabilitation conference was scheduled so he could

resume rehabilitation for his knee and learn range of motion and strengthening exercises for his back.  (*Id*. at ¶ 68).

On April 27, 2004, after Anderson reported his "left leg gave way" the previous day, he was told to continue his medications.  Two days later he was seen for arthritic pain in his knee and received pain medication.  (*Id*. at ¶¶ 69 - 70).

On June 4, 2004, Plaintiff was seen by medical staff and complained of chronic back and leg pain for 21 years.  He was prescribed pain medication.  (*Id*. at ¶ 71).

On June 8, 2004, Anderson received a physical therapy tele-health evaluation by a physical therapist at the Federal Medical Center in Devens, Massachusetts.  (*Id*. at ¶ 72).  The subjective portion of the examination notes Anderson as reporting "I didn't have a cartilage tear, they just cleaned out me knee." Normal ambulation was noted.  Anderson reported that the physical therapist at Springfield told him that his knee problems were coming from his back.  Anderson believes the physical therapist based this diagnosis "on everything he saw during treatment." (*Id*. at ¶ 73).  According to the physical therapist at Devens, Anderson's subjective complaints did not match the objective findings.  (*Id*. at ¶ 74).  Several exercises for Anderson's back were demonstrated.  A prescription for pain medication and an exercise packet were forwarded, and given, to Anderson. (*Id*. at

¶¶ 75 - 76).  On June 17, 2004, Anderson was seen for back pain and education on medication compliance.  (*Id*. at ¶ 77).

On June 18, 2004, Anderson received a electrophysiological ("EP") evaluation for his lumbar spine, lower extremity pain and paresthesia.[3]  All test results were within normal limits.  (*Id*. at ¶ 78).

On August 27, 2004, Anderson complained of lower back pain radiating down into his left knee.  The physician's assistant examining Anderson indicated he would discuss Anderson's complaint with the doctor.  In response to the physician's assistant's request for a recommendation, the clinical director ordered staff to "continue conservative treatment."  (*Id*. at ¶¶ 79- 80).

Four days later Anderson was seen again for left knee and back pain.  No signs of acute distress or discomfort were noted.  (*Id*. at ¶ 81).  The physician examining Anderson requested an orthopedic consultation/evaluation of his left knee. The request was denied by the clinical director on September 1, 2004, and "continue conservative treatment" was ordered.  (*Id*. at ¶¶ 82 - 83).

---

[3]  Paresthesia is a term to describe subjective abnormal neurological sensations which include numbness, tingling, burning, prickling and hyperesthesia (increased sensitivity).

Anderson was seen on October 25, 2004, for weakness and pain in his left leg and left side back pain.  Anderson's 1981 gunshot wound was noted, and he was precribed medication to relieve his symptoms.  X-rays of his left knee and hip were ordered.  (*Id*. at ¶ 84).  The October 28, 2004, x-rays revealed no evidence of recent fracture or other significant abnormality. (*Id*. at ¶ 85).

On November 8, 2004, during his routine chronic care visit, Anderson was treated for "several months of left lumbar pain radiating to left gluteus to left calf muscle."  (*Id*. at ¶ 86).  Staff suggested exercises to help with his lower back pain. (*Id*. at ¶ 87).

Anderson was seen on February 11, 2005, for his quarterly appointment and reported that his left knee and back pain continued, but he showed no sign of acute distress or discomfort.  Anderson was again educated on the need to comply with his medication.  (*Id*. at ¶ 88).  On February 22, 2005, it was noted that Anderson complained of a history of chronic lower back pain and that he was already under treatment for the same complaints with the chronic care physician.  He received a "one-day idle" due to his history of back pain.  (*Id*. at ¶ 89).

Defendant Jon Hemphill is a member of the United States Public Health Service and is employed in the Health Services

department at USP-Lewisburg.  In his role as Health Services
Administrator he does not personally examine or provide medical
treatment to inmates.  (*Id*. at ¶¶ 90 - 91).


III.   *Discussion*.

        Anderson argues that USP-Lewisburg medical officials
"misdiagnosed" his left knee condition.  The misdiagnosis was
revealed by his October 27, 2003, arthroscopic surgery, performed
at USMCFP-Springfield, which found his ACL ligament to be intact,
contradicting USP-Lewisburg medical staff's impression  based on
Anderson's subjective complaints, x-rays, physical findings by an
orthopedic consultant, and MRI testing indicating it was torn.

        Anderson also argues that he continues to be
misdiagnosed as he is not receiving adequate treatment for his
back resulting in continued severe knee and back pain.  He makes
this conclusion of inadequate treatment based on a statement by a
USMCFP-Springfield physical therapist's assessment that his
problems were back related.  (Doc. 14).  He alleges the
conservative treatment he is being provided by the USP-Lewisburg
staff "is not working and [he] is in dire need of an outside
consultant evaluation and an MRI of his back." (Doc. 1).  He
also claims he is not receiving physical therapy at the facility

-13-

as it does not have a licensed physical therapist on staff or a
physical therapy program in place.  (*Id.*)

> A. *Anderson cannot Bring A Bivens Action Against*
>    *USP-Lewisburg's Health Service Administrator,*
>    *J. Hemphill.*

Defendants allege that Anderson may not bring a *Bivens*
action against J. Hemphill, in his position as USP-Lewisburg's
Health Services Administrator as he is a member of the United
States Public Health Service.  (Doc. 21).  We agree.  *See Cuoco
v. Moritsugu,* 222 F.3d 99, 107 (2d Cir. 2000)(doctor and prison
medical director entitled to immunity under the Public Health
Service Act, 42 U.S.C. § 233(a), against plaintiff's Bivens-type
claim of deliberate indifference to a serious medical condition).
If Anderson seeks to bring an action "for personal injury,
including death, resulting from the performance of medical,
surgical, dental, or related functions, including the conduct of
clinical studies or investigation, by any commissioned officer or
employee of the Public Health Service while acting within the
scope of his office or employment," the Federal Tort Claim Act,
28 U.S.C. §§ 2671, *et. seq.*, is the exclusive means by which to
do so.  *Cuoco,* 222 F.3d at 107 (the FTCA is the exclusive remedy
for medical malpractice committed by Public Health Service
employees acting within the scope of their employment); *see also*

-14-

*Whooten v. Bussanich*, No. Civ. 4:CV-04-223, 2005 WL 2130016, *3
(M.D. Pa. Sept. 2, 2005)(same); *Freeman v. Inch*, No.
3:04-CV-1546, 2005 WL 1154407, *2 (M.D. Pa. May 16, 2005)(same).
Accordingly, we will dismiss Anderson's *Bivens* claim against
Hemphill.

      B. *Failure to State An Eighth Amendment Claim.*

      A plaintiff, in order to state an actionable civil
rights claim, must allege, first, the deprivation of a
constitutional or federal right, and second, that the alleged
deprivation was committed by a person acting under color of law.
*Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety-
Division*, 411 F.3d 427, 433 (3d Cir. 2005) (section 1983 claim).
Civil rights claims cannot be premised on a theory of respondeat
superior.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.
1988).  Rather, each named defendant must be shown, via the
complaint's allegations, to have been personally involved in the
events or occurrences which underlie a claim.  *Evancho v. Fisher*,
___ F.3d ___, ____, 2005 WL 2179883, at *5 (3d Cir. 2005)(*quoting
Rode v. Delarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

      The Eighth Amendment "requires prison officials to
provide basic medical treatment to those whom it has
incarcerated."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.

1999)(*citing Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).  To establish a medical claim based on the Eighth Amendment, an inmate must allege (1) acts or omissions by prison officials sufficiently harmful (2) to evidence deliberate indifference to a serious medical need.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).  The inmate must satisfy this two-part, conjunctive test.  Without the requisite mental state, a prison official's conduct alone will not constitute deliberate indifference.  *See Farmer v. Brennan,* 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In the context of prison medical care, the Eighth Amendment can be violated by the deliberate indifference of: (1) prison doctors in their response to the prisoner's needs; (2) prison guards intentionally denying or delaying access to medical care; or (3) prison staff intentionally interfering with medical treatment once it is prescribed.  *Estelle v. Gamble,* 429 U.S. 97, 104 - 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).  However, if a prisoner is under the care of a medical experts, a non-medical prison official cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner . .

-16-

. .ʺ *Spruill,* 372 F.3d at 236; *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (prison personnel who are not physicians cannot be considered deliberately indifferent for failing to respond to an inmate's medical needs when the inmate is already receiving treatment from the prison's medical staff).

To be deliberately indifferent, a prison official must know of, and disregard, an excessive risk to inmate health or safety. *Farmer, supra,* 511 U.S. at 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. . . .ʺ *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976).

Accordingly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id.*, 429 U.S. at 107, 97 S.Ct. at 293. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. *See White v. Napoleon,* 897

-17-

F.2d 103, 110 (3d Cir. 1990).  In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

In the present case, none of the BOP defendants (Warden Smith, Regional Director Dodrill, or Administrator Watts) are physicians, physician assistants or nurses.  Hence, Anderson fails to state an Eighth Amendment claim of deliberate indifference against them.  *See Durmer, supra*.  Additionally, none of the defendants are alleged to have had any direct contact with Anderson related to his medical-care concerns (aside from Warden Smith responding to a letter inquiry from a Congresswoman).  *See* Doc. 1-2, p 6.  Thus, Anderson fails to allege that defendants Watts, Dodrill, or Smith were personally involved in his medical treatment, or had reason to believe that the medical staff at USP-Lewisburg were mistreating, or not treating, his various medical ailments.  Anderson simply identifies the defendants by their title in his complaint and does not mention them anywhere in his statement of the claim.  He does not allege any facts to support a conclusion that these supervisory defendants had personal involvement in the medical treatment he received at USP-Lewisburg.  Further, as there is no

-18-

respondeat superior liability in a civil rights action, he cannot hold these defendants responsible for the unknown acts of their subordinates simply because of their supervisory position.  *See Rode, supra; Evanko, supra.*  Thus, Anderson fails to state a claim against Watts, Dodrill, or Smith.

As it stands, Anderson's complaint clearly fails to state a claim upon which can be granted against any of the named defendants.  In such situations, District Courts must give Plaintiff an opportunity to amend his complaint, or otherwise determine that any amendment would be inequitable or futile.  See *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir.2004); *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002).  In this case, based upon the expansive summary judgment record before us, any amendment to the complaint alleging an Eighth Amendment claim against Anderson's treating physicians at USP-Lewisburg would be futile.  A review of the documentation submitted by Defendants, specifically Anderson's medical record, reveals that he was seen and treated numerous times for complaints of knee and back pain. The medical chart reveals that his complaints of pain and discomfort were not ignored.  He was seen when requested and prescribed various pain medications, creams, and braces to assist him.  He was provided with, and educated on the need for, physical therapy for the purpose of strengthening his lower back

-19-

muscles.  He was provided a diagnostic MRI of his knee in the face of his knee complaints, and later arthoscopic surgery to correct a tear in the lateral meniscus and remove loose body and bone spurs.  The fact that his ACL was found to be intact when originally thought to be torn does not demonstrate an actionable "misdiagnosis" as suggested by Anderson.  *See*, *Durmer*, *supra*.  As for his continued lower back pain, again, the medical chart indicates he was seen on a regular basis for this complaint.  He was prescribed pain medications, had diagnostic testing (x-rays and EP studies) to determine the existence of nerve impingement in his lower lumbar region.  All of this studies were non-remarkable or within normal limits.  Anderson was repeatedly advised to do home exercises to strengthen his core muscles.  He apparently believes he should be performing these exercises under the watchful eye of a physical therapist.  However the record has repeated instances of patient education given to Anderson on how to perform these exercises.  The record before the court establishes meaningful efforts by the USP-Lewisburg medical staff to provide Anderson with medical care for both his knee and back complaints.  Thus, the attendant requisite mental state for asserting a claim of deliberate indifference is lacking, and any opportunity to amend the complaint to assert an Eighth Amendment

claim against members of the USP-Lewisburg medical staff would be
futile.

Anderson has failed to present any evidence from which
a reasonable jury could conclude that the treating physicians at
USP-Lewisburg possessed the culpable mental state necessary for
Eighth Amendment liability to attach.  There is insufficient
proof in the record for a fair-minded jury to conclude that the
Defendants, or other USP-Lewisburg medical staff members, were
deliberately indifferent to his serious medical needs.  *See
Estelle, supra.*  The scope and quality of medical attention that
Anderson has received at USP-Lewisburg precludes a finding of
deliberate indifference.  Anderson's disagreement with
unidentified medical personnel's decision to continue with
"conservative treatment" of his back pain is at best a subjective
disagreement with the treatment decisions and medical judgment of
the medical staff and/or negligence.  However, as simple
negligence cannot serve as a predicate to liability in this
matter, Anderson's civil rights complaint, and any conceivable
amendment to it, fails to articulate an arguable Eighth Amendment
claim.  *See White, supra; Durmer, supra.*

We will issue an appropriate order.


                                        /s/William W. Caldwell
                                        William W. Caldwell
                                        United States District Judge

Date: September 22, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KENNETH ANDERSON,                    :
                                     :
        Plaintiff                    :
                                     :    CIVIL NO. 1:CV-04-2666
        vs.                          :
                                     :    (Judge Caldwell)
BUREAU OF PRISONS, *et al.*,         :
                                     :
        Defendants                   :


*O R D E R*

AND NOW, this 22nd day of September, 2005, for the reasons set forth in the accompanying memorandum, it is ordered that:

    1.  Defendants' motion to dismiss, or in the alternative, motion for summary judgment (doc. 19) is granted.

    2.  The Clerk of Court shall enter judgment in favor of the defendants Dodrill, Watts, Smith and Hemphill, and against Plaintiff, and close this file.

    3.  Based on our decision today, Plaintiff's motion for preliminary injunction (doc. 14) is denied.

    4.  Any appeal of this order would not be in good faith.


                              /s/William W. Caldwell
                              William W. Caldwell
                              United States District Judge